***********
The Full Commission reviewed the prior Opinion and Award based upon the record of the proceedings before Chief Deputy Commissioner Gheen and the briefs and oral arguments before the Full Commission. The appealing party has not shown good grounds to reconsider the evidence; receive further evidence; rehear the parties or their representatives; or amend the Opinion and Award, except for minor modifications. Accordingly, the Full Commission affirms the Opinion and Award of Chief Deputy Commissioner Gheen with minor modifications.
 *********** *Page 2 
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties as:
 STIPULATIONS
1. The plaintiff-employee was employed by defendant-employer, Norandal USA, Inc., from August 1, 1976 until December 1, 2004.
2. Global Indemnity, Royal and SunAlliance, Argonant Insurance Company, Argonant Midwest Insurance Company, National Union and Cigna/ACE USA/ESIS provided workers' compensation coverage during the plaintiff-employee's employment with the defendant-employers. For purposes of this claim, Cigna/ACE USA/ESIS shall be responsible for any workers' compensation benefits awarded to the plaintiff-employee as a result of his employment with the defendant-employers.
3. The parties are subject to the North Carolina Workers' Compensation Act, the defendant-employer employing the requisite number of employees to be bound under the provisions of said Act.
4. In addition, the parties stipulated into evidence the following:
 a. The Pre-Trial Agreement dated May 1, 2006.
 b. One volume of documents, which included Industrial Commission records, discovery responses, medical records and reports and personnel records, in IC 261514.
 c. Two volumes of documents, which included Industrial Commission records, discovery responses, medical records and reports and personnel records, in IC 078061. *Page 3 
 d. Two volumes of documents, which included Industrial Commission records, discovery responses, medical records and reports and personnel records, in IC 014133.
 e. Two volumes of documents, which included Industrial Commission records, discovery responses, medical records and reports and personnel records, in IC 226564.
 f. Two volumes of documents, which included Industrial Commission records, discovery responses, medical records and reports and personnel records, in IC 226563.
 g. Three volumes of documents, which included the transcript of proceedings in Daywalt v. Norandal USA and the stipulated exhibits from that case.
 h. Three volumes of documents, consisting of corporate records and an asbestos survey in IC 041133.
 i. Additional medical records relating to IC 226563.
 j. Additional medical records relating to IC 078061.
 k. Additional medical records relating to IC 226564
 l. Additional medical records relating to IC 014133
 m. Additional medical records relating to IC 261514.
5. The Pre-Trial Agreement dated May 1, 2006, which was submitted by the parties, is incorporated by reference.
 ***********
Based upon all of the competent evidence of record and reasonable inferences flowing therefrom, the Full Commission makes the following: *Page 4 
 FINDINGS OF FACT
1. Plaintiff, who is now fifty-seven years old, began working for defendant-employer's predecessor in August 1974. The plant in Salisbury where he worked produced aluminum foil of various thicknesses and widths, according to the specifications of its customers. Republic Foil built the facility in approximately 1965. The original plant had two foil separators, two slitters, one coil annealing furnace and six foil annealing furnaces. In subsequent years, one additional separator and another coil annealing furnace were added to the original building.
2. The plant was later purchased by National Aluminum, which expanded the facility in 1979 and 1980 to add a new building to which the casting operations were moved. During the expansion and the next six years, further equipment was added. By 1986 plant production was over 90 million pounds. Production increased further after another coil annealer was added. Norandal USA, Inc. then bought the facility in approximately 1989.
3. The process used by the plant involved melting raw aluminum, casting it into sheets, rolling sheets in mills until it achieved the desired thickness, cutting, or slitting the foil to the specified width and then winding it onto a core either as double or single sheets. In addition, the coils were heated to high temperatures in annealing furnaces at certain stages of the process in order to make the aluminum more flexible and strong and in order to remove oils and other residues.
4. When the original annealing furnaces were built, insulation containing asbestos was used in the walls, ceilings and floors. The wall insulation was sandwiched between an outer steel wall and an inner steel plate. When the furnaces were new, there was no asbestos insulation exposed along the walls and ceilings. *Page 5 
5. In a separate room within the original plant, employees machined sheets of Maranite, which looked like sheet rock but was much harder. The Maranite was used to make "tips" for the casting process. During the 1960s and 1970s, Maranite contained twenty-five to fifty percent asbestos. The employees in the Maranite shop drilled, sawed and sanded the Maranite sheets to achieve the desired shape for the tips. After the expansion in 1980, the process was moved to the new casting building. However, it appeared that the Maranite manufacturer stopped making the product in 1978, so it was not clear how much longer the plant used asbestos-containing Maranite to make tips. After the asbestos-containing Maranite was no longer available, the plant began using a ceramic material.
6. In 1972 plant management asked the State Board of Health to conduct an industrial hygiene survey of the Maranite shop. An industrial hygienist performed the survey and prepared a report in which he noted that the woodworking machines in the shop were equipped with hoods connected to an exhaust ventilation system, but that there was no means of dust control for hand-sanding. Air sampling conducted on employees working in the Maranite shop revealed levels of asbestos significantly above the permitted exposure limit, which at that time was well above the exposure limits later specified by OSHA. Consequently, the plant was advised to increase the volume of air drawn into the exhaust system.
7. In 1973 Z. L. Brown prepared a memorandum explaining to plant management how the OSHA standards for asbestos exposure were going to change and what procedures would be necessary for compliance. Some of the procedures he described were later implemented, but the vacuum system was not upgraded.
8. Subsequent industrial hygiene surveys did not result in any asbestos-related OSHA violations. However, in a report filed in 1985, insulation was noted to have fallen from the walls *Page 6 
of the annealing furnaces by NIOSH investigators. Testing revealed that the insulation contained five to eight percent asbestos. An industrial hygienist performed air sampling of the furnace crew and reported acceptable levels of asbestos exposure but noted that there was no recommended limit for exposure to bulk material and loose insulation containing asbestos. He expressed concern about the deteriorating insulation that was falling out of the furnaces, not only for the furnace crew but for other employees, as well, because convective air currents could carry asbestos fibers into the plant. He recommended a regular maintenance program for the furnaces as well as a monitoring program and advised the company to take corrective action by either sealing or removing the deteriorating insulation.
9. The industrial hygienist also noted that no clean-up activities were performed during his monitoring process and that it was more likely that employees would be exposed to short term high levels of asbestos rather than elevated full shift exposures. On the other hand, despite employee reports of seeing material being carried out of the furnaces on air currents, he did not observe that occurring.
10. Some air sampling was conducted in January 1987 during a cleaning process when scrap foil was being removed from one of the annealing furnaces. Although the sampling was not conducted for a long enough period to determine a proper time weighted average exposure, it showed the employee was exposed to 2.8 fibers per cubic centimeter of air during the time involved. Consequently, F. N. Bassinger suggested that protective clothing and respirators be provided to the employees performing that task until the problem was corrected. Despite that recommendation, the plant did not require employees to use protective clothing or respirators.
11. Further air sampling was conducted in November 1987 after regular cleaning of one of the furnaces and it revealed asbestos levels of 2.1 fibers per milliliter of air. This sampling *Page 7 
was also conducted for too short of a period to derive a proper time weighted average exposure. Elevated asbestos levels were also subsequently revealed by air sampling at one of the furnaces in 1990. The company then began the process of removing and replacing the insulation in the older annealing furnaces. It hired companies that specialized in asbestos abatement to perform the work, but the plant only had one furnace modified at a time because of the expense and the loss of productivity involved. The area was tented during the abatement process.
12. Laboratory testing of the insulation when the first furnace was abated in July or August 1990 revealed that there was block insulation containing fifteen to thirty percent asbestos and duct insulation containing thirty-five to fifty-five percent asbestos in the annealing furnace.
13. During the years of the abatement activities, there were several memoranda to plant management noting that the insulation in the annealing furnaces had deteriorated, that loose pieces were sometimes falling out and that there were loose protection panels in the walls and doors to the furnaces. The abatement process was completed in approximately 1998.
14. In about 1978 an explosion occurred in annealing furnace No. 21 which caused the door of the furnace, which weighed several tons, to fly forty to sixty feet into the plant, and which sent dust and debris throughout the plant. It took at least one month to clean up after the explosion.
15. Throughout the periods in question, the plant was ventilated by large overhead exhaust fans. There were also fans inside of the furnaces which distributed the heat. The heat and air movement inside the furnaces were part of the reason that insulation in the walls and doors would deteriorate and break off. The plant used a vacuum system to remove and capture scrap pieces of aluminum so that the aluminum scrap could be reprocessed. The vacuum system drew in dust and debris from the machines as well as the scrap aluminum. The aluminum pieces as well *Page 8 
as the dust and debris would go through a "cyclone" which separated the aluminum scraps, but the rest of the dust went through a wire mesh and exited inside the plant, not outside. Employees also used compressed air to clean their machines. Consequently, there were multiple ways that dust containing asbestos fibers would spread within the plant.
16. Plaintiff began working at the plant in August 1976 as an etching operator but was laid off after several months. When he was rehired in January 1976, he was assigned to a utility position on rolling mill number 1. In that position, he hauled and banded coils of aluminum and loaded them onto the mill. In February 1978 he was promoted to mill helper and later that year he was reassigned from rolling mills number 2 and 3 to rolling mill number 1. There was a labor strike beginning in November 1979 and plaintiff apparently returned to work afterwards on machines number 2 and 3. In October 1980 he began training as a mill operator "A" and he worked as a mill operator until 2002 when he became a metal handler in the casting department.
17. Before the plant expansion, the rolling mill department was located beside the Maranite shop and the electrical room. It was not close to the annealing furnaces but plaintiff would walk by them when going outside of the building for a break. The Maranite shop was an enclosed room with two doors leading into the plant that were usually kept closed. Since the Maranite shop was cooler than the mill department, Plaintiff would sometimes go in there for brief periods in order to cool off during the warm months. However, someone had to always be monitoring the mills, so he could not leave his workstation for long. In addition, he usually did not use the room for breaks when he worked during first shift because that was the shift when tips were being made.
18. After the plant expansion and the tip shop was moved to the new building, plaintiff did not work in close proximity to the sources of asbestos dust. There was no evidence that *Page 9 
rolling mills contained any type of material that contained asbestos, and the slitter department separated the rolling mills from the annealing furnaces.
19. As of the date of hearing before the Deputy Commissioner, plaintiff had smoked one to two packs of cigarettes per day for well over thirty years.
20. On May 2, 2001 plaintiff went to a local hotel to be examined by a Dr. Gaziano, a pulmonologist from West Virginia who had been hired by his attorneys to examine employees of the plant. Dr. Gaziano either did not get an accurate history from him or made incorrect assumptions about the nature of his exposure to asbestos dust as well as the nature of the asbestos-containing materials in the plant. The doctor assumed that plaintiff had had considerably more exposure than he actually had.
21. Plaintiff apparently advised Dr. Gaziano that he had smoked two packs of cigarettes per day for 35 years, that he had had a productive cough for three to four years and that he would get short of breath climbing steps. The doctor read chest x-rays performed in January 2001 as showing irregular opacities in both lung bases with a 1/0 profusion. However, there were no pleural abnormalities. Pulmonary function tests were reported to show moderately severe obstructive and restrictive ventilatory impairment with increased lung volumes due to hyperinflation and moderate diffusion impairment. Dr. Gaziano diagnosed plaintiff with asbestosis as well as with chronic obstructive pulmonary disease.
22. Dr. Farrington was plaintiff's primary care physician and treated him periodically over the years for sinusitis, allergic rhinitis, bronchitis, chronic obstructive pulmonary disease, hypertension, back pain and a probable transient ischemic attack.
23. After plaintiff filed this asbestosis claim, defendants sent his January 2001 x-rays to Dr. Goodman, a radiologist at Duke Medical Center. It was his impression that the lateral film *Page 10 
was overexposed. Nevertheless, he could see that there were increased lung volumes consistent with emphysema. The PA film was just slightly overexposed and demonstrated normal lungs and pleural space. Consequently Dr. Goodman concluded that there was no evidence of asbestosis or asbestos-related pleural disease.
24. In August 2003 plaintiff underwent additional x-rays, which were read by Dr. Dula. The doctor found no interstitial changes or pleural plaques, but saw hyperexpansion of the lungs, consistent with chronic obstructive pulmonary disease. Dr. Erston subsequently reviewed chest x-rays in February 2004 and also found no evidence of asbestosis.
25. Defendants sent plaintiff to Dr. Kremers, a pulmonologist in Charlotte for evaluation. Dr. Kremers examined him on September 18, 2004 and noted that his breath sounds were moderately diminished. Review of his x-rays showed the changes associated with emphysema but there was no evidence of pulmonary fibrosis or pleural changes. Pulmonary function testing revealed a severe obstructive defect and results consistent with tobacco-induced chronic obstructive lung disease with mild reversibility after bronchodilator medication. Based upon the evaluation, Dr. Kremers concluded that the plaintiff had no evidence of asbestosis.
26. Pleural and interstitial changes caused by asbestos fibers do not improve or disappear with time. Consequently, if such changes are present, subsequent x-rays should show them as least as well as earlier films. Only one doctor indicated that plaintiff's x-rays revealed signs of interstitial fibrosis, and other doctors reviewing the same films did not see those changes. None of the subsequent x-ray films were read as showing any interstitial or pleural abnormalities. The greater weight of the medical evidence clearly established that plaintiff did not have asbestosis or asbestos-related pleural disease. *Page 11 
27. As of the date of the hearing before the Deputy Commissioner, plaintiff had not developed asbestosis. Furthermore, he did not prove that he developed any asbestos-related pleural disease. Consequently, he did not prove that he developed an occupational disease which was due to causes and conditions characteristic of and peculiar to his employment with defendant employer and which excluded all ordinary diseases of life to which the general public was equally exposed.
28. Because of the Findings of Fact leading to the result in this case, it is unnecessary to address Plaintiff's remaining issues.
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission reaches the following:
 CONCLUSIONS OF LAW
1. As of the date of hearing before the Deputy Commissioner, plaintiff had not developed asbestosis, the characteristic fibrotic condition of the lungs caused by inhalation of asbestos dust. N.C. Gen. Stat. §§ 97-53(24); 97-62.
2. Plaintiff has also not proven that he developed an occupational disease of the pleura which was due to causes and conditions characteristic of and peculiar to his employment and which excluded all ordinary diseases of life to which the general public was equally exposed. N.C. Gen. Stat. § 97-53(13); Booker v. DukeMedical Center, 297 N.C. 458 (1979).
 ***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following:
 AWARD *Page 12 
1. Plaintiff's claim for workers' compensation benefits is hereby DENIED.
2. Each side shall pay its own costs. This __ day of November 2008.
 S/___________________ CHRISTOPHER SCOTT COMMISSIONER
CONCURRING:
 S/___________________ BUCK LATTIMORE COMMISSIONER
 S/___________________ PAMELA T. YOUNG CHAIR *Page 1